UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SAMUEL C. MATTHEWS,

                              Plaintiff,

          v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                              Defendant.

Case No. 3:10-cv-05496-BHS-KLS

REPORT AND RECOMMENDATION

Noted for July 8, 2011

Plaintiff has brought this matter for judicial review of defendant's denial of his

application for disability insurance benefits.  This matter has been referred to the undersigned

Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as

authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing

the parties' briefs and the remaining record, the undersigned submits the following Report and

Recommendation for the Court's review, recommending that for the reasons set forth below,

defendant's decision be reversed and remanded for further administrative proceedings.

FACTUAL AND PROCEDURAL HISTORY

On April 6, 2006, plaintiff filed an application for disability insurance benefits, alleging

disability as of September 21, 2001, due to polyarthraligias, multiple joints with fibromyalgia,

knee pain, a fake elbow, coronary artery disease, post traumatic stress disorder ("PTSD"),

REPORT AND RECOMMENDATION - 1

chronic depression with anxiety, and a bipolar disorder. See Tr. 17, 122, 133, 145. His

application was denied upon initial administrative review and on reconsideration. See Tr. 17, 86,

93, 96. A hearing was held before an administrative law judge ("ALJ") on January 29, 2009, at

which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. See Tr.

36-83.

On May 28, 2009, the ALJ issued a decision in which plaintiff was determined to be not

disabled. See Tr. 17-35. Plaintiff's request for review of the ALJ's decision was denied by the

Appeals Council on May 15, 2010, making the ALJ's decision defendant's final decision. See Tr.

1; see also 20 C.F.R. § 404.981. On July 13, 2010, plaintiff filed a complaint in this Court

seeking judicial review of the ALJ's decision. See ECF #1-#3. The administrative record was

filed with the Court on September 27, 2010. See ECF #9. The parties have completed their

briefing, and thus this matter is now ripe for the Court's review.

Plaintiff argues defendant's decision should be reversed and remanded for an award of

benefits or, in the alternative, for further administrative proceedings, because the ALJ erred: (1)

in failing to properly consider a determination that plaintiff was disabled made by the United

States Department of Veterans Affairs ("VA"); (2) in failing to properly consider the functional

limitations stemming from plaintiff's PTSD and depression; (3) in evaluating the medical

evidence in the record; (4) in assessing plaintiff's credibility; (5) in evaluating the lay witness

evidence in the record; (6) in assessing plaintiff's residual functional capacity; (7) in finding him

to be capable of returning to his past relevant work; and (8) in not finding him to be disabled at

step five of the sequential disability evaluation process.[1] The undersigned agrees defendant erred

---

[1] Defendant employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step thereof, the disability determination is made at that step, and the sequential evaluation process ends. See id. If a claimant cannot perform his or her past relevant work at step four of the sequential disability evaluation process, at

REPORT AND RECOMMENDATION - 2

in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while defendant's decision to deny benefits should be reversed, this matter should be remanded for further administrative proceedings.

<u>DISCUSSION</u>

This Court must uphold defendant's determination that plaintiff is not disabled if the proper legal standards were applied and there is substantial evidence in the record as a whole to support the determination. <u>See</u> <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>See</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. <u>See</u> <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold defendant's decision. <u>See</u> <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.     <u>The VA's Determination of Disability</u>

Although a determination by the VA about whether a claimant is disabled is not binding on the Social Security Administration ("SSA"), an ALJ must consider that determination in reaching his or her decision. <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076 (9th Cir. 2002); 20 C.F.R. § 404.1504. Further, the ALJ "must ordinarily give great weight to a VA determination of disability." <u>McCartey</u>, 298 F.3d at 1076. This is because of "the marked similarity" between the two federal disability programs:

Both programs serve the same governmental purpose--providing benefits to

---

step five the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. <u>See</u> <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e).

REPORT AND RECOMMENDATION - 3

those unable to work because of a serious disability. Both programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims. . . . Both programs have a detailed regulatory scheme that promotes consistency in adjudication of claims. Both are administered by the federal government, and they share a common incentive to weed out meritless claims. The VA criteria for evaluating disability are very specific and translate easily into SSA's disability framework.

Id. However, "[b]ecause the VA and SSA criteria for determining disability are not identical," the ALJ "may give less weight to a VA disability rating if he gives persuasive, specific, valid reasons for doing so that are supported by the record." Id. (citing Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001). Here, the ALJ did so.

Specifically, the ALJ found in relevant part:

I have . . . considered various VA rating determinations contained in the record. A statement from the VA dated February 2009 indicates that the claimant receives $995.00 per month as pension for a non-service connected disability, and that he is considered "permanently and totally disabled due to a non-service connected disability" (Ex. 19F/4). The rating decision indicates that the claimant was found disabled for VA purposes effective September 1, 2005, for the non-service connected conditions of polyarthraligias of multiple joints with fibromyalgia, multiple joint pain, bilateral knee and ankle pain, and hand pain and numbness, as well as residuals of a fractured right elbow with ulnar nerve neuropathy and decreased sensation to fingers of the right hand, and chronic depression with anxiety (Ex. 20F/3, 5, 7-8).

. . .

. . . [A] review of the Veteran's Administration decision regarding the claimant's alleged disability shows that there was limited evidence regarding the claimant's functional capacity. For example, the determinations relied on examinations that did not test the claimant's functioning, but rather recorded the claimant's complaints, as noted in the above discussion of the VA treatment records. [see Tr. 19-24.] Moreover, the rating decision itself does not contain a significant analysis of the medical records, but merely recites what the claimant was seen for, deems the conditions "severely disabling," and states what medications were provided for the claimant's conditions (*see, e.g.*, Ex. 20F/9-10). Further, the decision contains no discussion of the claimant's documented activities, which establish greater functioning than he

alleges, and contains no indication of any specific limitations resulting from the claimant's conditions. Conversely, the instant record contains a residual functional capacity assessment prepared by state agency medical experts who reviewed the record of evidence available at that time. Moreover, I have reviewed additional records that include objective testing, which, as discussed above, fail to contain sufficient support for the extent of the limitations alleged, and I have also considered evidence documenting the claimant's significant activities and level of functioning. This evidence supports the finding that the claimant has the residual functional capacity to perform light work . . . The VA disability rating does not consider the same factors that are required in the instant disability determination. Accordingly, the determination is not persuasive with regard to the ultimate question in a Social Security disability determination, that is, whether the claimant can perform any work activity. For all these reasons, I do not accord significant probative weight to the VA determination.

Tr. 33-34. Plaintiff argues none of the reasons the ALJ gave here for declining to adopt the VA's determination of disability are valid. The undersigned disagrees.

As the ALJ noted, the medical records on which the VA appeared to base their disability determination – and which the ALJ discussed in detail in his decision – are devoid of evidence regarding plaintiff's actual functioning. See Tr. 19-24, 34. Plaintiff does not dispute this finding. While it is true the records the VA relied on do contain objective clinical findings in addition to plaintiff's subjective complaints, the point is that those clinical findings still fail to indicate there were any functional limitations present, a necessary requirement for establishing disability under the Social Security Act. See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) ("The mere existence of an impairment is insufficient proof of a disability").

In regard to the ALJ's statement that the VA disability determination itself contained no "significant analysis of the medical records," that it merely recited "what [plaintiff] was seen for," deemed "the conditions 'severely disabling,'" and stated "what medications were provided for" those conditions, and that it contained "no discussion of [his] documented activities, which establish greater functioning" than alleged and "no indication of any specific limitations resulting

from [his] conditions" (Tr. 34; <u>see also</u> Tr. 890-900), plaintiff asserts the VA's determination is based on a review of his "complete medical records" showing many impairments requiring many medications (ECF #11, p. 15). But as discussed above, the mere existence of impairments – or of prescribed medications for that matter – is insufficient to establish the presence of significant work-related limitations, let alone disability.

Plaintiff goes on to argue that the evidence in the record concerning his activities of daily living do not demonstrate an ability to perform light work as found by the ALJ. But as discussed below, the ALJ did not err in so finding in this case. Plaintiff also argues it was improper for the ALJ to rely on the residual functional capacity assessment prepared by the "state agency medical experts who reviewed the record of evidence available at that time" (Tr. 34), because they did not review <u>all</u> of the medical evidence in the record. But what the ALJ in fact stated, as noted above, was that based on his own review of the "additional records" that the VA was not able to review (and presumably those the state agency medical experts also could not review, but which were part of the entire record before the ALJ), that assessment was supported.

Lastly, plaintiff argues the ALJ's statement that the VA's disability determination "is not persuasive with regard to the ultimate question in a Social Security disability determination, that is, whether the claimant can perform any work activity" (Tr. 34), is merely conclusory and thus is not persuasive. That statement, however, must be read in context. Specifically, the ALJ made that statement only <u>after</u> first discounting the VA's disability determination based on the reasons he gave for doing so discussed above. Accordingly, the ALJ did not err here.

II.    <u>Functional Limitations Stemming from Plaintiff's PTSD and Depression</u>

At step two of the sequential disability evaluation process, the ALJ must determine if a claimant's impairments are "severe." 20 C.F.R. § 404.1520. An impairment is "not severe" if it

does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), (c); see also Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; see also Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that his "impairments or their symptoms affect [his] ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. See Smolen, 80 F.3d at 1290.

In this case, the ALJ found plaintiff's obesity, chronic obstructive pulmonary disorder, fibromyalgia, right ulnar neuropathy, and syncopal episodes rule out anemia to be "severe" impairments. See Tr. 19. Plaintiff argues the ALJ erred in failing to also find his PTSD and depression to be severe as well (see Tr. 26), and in failing to consider how those impairments affected his residual functional capacity to perform work. But plaintiff has pointed to no actual evidence showing – or argued with any specificity demonstrating[2] – that such impairments were either severe or had any significant impact on his ability to perform work-related activities. As such, the undersigned finds no error here, particularly in light of the ALJ's proper evaluation of the medical evidence in the record concerning plaintiff's mental impairments and limitations, as

---

[2] See Carmicle v. Commissioner of Social Sec. Admin., 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (issue not argued with specificity in briefing will not be addressed); Kim v. Kang, 154 F.3d 996, 1000 (9th Cir.1998) (matters not specifically and distinctly argued in opening brief ordinarily will not be considered).

discussed in greater detail below.

III.    The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him

or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see</u> <u>also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>See</u> <u>Lester</u>, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Sec. Admin.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004); <u>see</u> <u>also</u> <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

A.    Dr. Jensen

In determining plaintiff had no severe mental impairment, the ALJ evaluated the medical evidence from plaintiff's treating psychiatrist, Carl F. Jensen, M.D., and other medical sources in the record, finding in relevant part as follows:

> The medical evidence establishes the existence of mental health diagnoses, however, the record considered as a whole shows that the conditions were nonsevere through the date last insured because they did not result in more than minimal limitations in the claimant's ability to perform basic, work-related activities. The record establishes that the claimant's symptoms were controlled with medications, and reflects relatively benign findings that do not support significant mental health-related limitations.
>
> The claimant received mental health treatment from [Dr.] Jensen . . . at the VA, whose records reflect diagnoses of major depressive disorder and PTSD.

Dr. Jensen prescribed medications including Celexa, Trazodone and Ambien (*see generally* Exs. 1F and 11F). Dr. Jensen's longitudinal treatment records reflect consistent stability of the claimant's condition with medication, and contain unremarkable mental status examination findings. For example, in September 2005, Dr. Jensen noted the claimant's report that his mood and affect had been stable and that medications remained helpful and he tolerated them well. (Ex. 1F/145). In October 2005, Dr. Jensen noted that the claimant complained of frustration from issues and conflicts at home about "the demands for him to work too much and other people not doing their part." The claimant reported that the home had "20 dogs and other animals" and that he did "most of the cooking and cleaning, etc." The claimant reported that his mood changed with the conflicts at home, however, he reported "no major depression" and said that his sleep and appetite were generally good. Upon mental status examination, Dr. Jensen noted that the claimant was well groomed, calm, and coherent. He described his mood as fairly happy and noted flexible affect. Memory was intact (Ex. 1F/140). In January 2006, Dr. Jensen noted the claimant's report that he was generally doing well regarding mood, anxiety, sleep, and eating. He reported some stress from "dealing with his wife and kids, work around the house." The claimant requested an increase in Celexa because he said it had helped him tolerate stress and anxiety better. Mental status examination findings were unchanged. Dr. Jensen stated that the claimant's depression and anxiety were fairly stable (Ex. 1F/121). In September 2006, the claimant reported that he was "doing OK," although he reported some stress from conflicts at home regarding child discipline, but he said that things were "generally going all right" and reported no problems with his medications. Dr. Jensen stated that the claimant was "stable" and "doing pretty well" (Ex. 11F/125).

Subsequent records reflect continued unremarkable findings. In July 2006, Dr. Jensen stated that the claimant complained of some ill health related to pneumonia, nonetheless, he said that he hoped "to get out fishing," and said that his mood had generally been better, with less anxiety and agitation. The claimant's mood was described as "worried about his health, but fairly happy," and his affect was flexible. Dr. Jensen stated that PTSD and depression were generally improved and more stable with increased Celexa (Ex. 11F/175). In September 2006, the claimant reported having nightmares of a car accident since he had been involved in one several weeks earlier. Dr. Jensen stated that the claimant did not have problems with nightmares prior to the accident, but was having an acute stress reaction. He prescribed Prazosin for nightmares (Ex. 11F/89). In November 2006, Dr. Jensen noted that the claimant reported feeling "better, with less depression, less anxiety or irritability, and no more nightmares" despite the fact he stopped taking Prazosin. The claimant was noted to be well groomed, calm, and coherent, with fairly happy mood and flexible affect. Dr. Jensen stated that the claimant was improved and stable (Ex. 11F/73). He performed a depression screen in which the claimant reported that he did "not at all" feel down, depressed, or

hopeless. The screen was negative (Ex. IIF/74). Significantly, records pertaining to the period after the date last insured reflect continued stability and bolster the conclusion that the claimant's mental health condition was nonsevere during the period at issue. For example, Dr. Jensen saw the claimant in January 2007 and noted the claimant's report of stable mood. Dr. Jensen assessed the claimant as stable and doing fairly well, noting that his medications remained helpful and well tolerated (Ex. 18F/37).

Dr. Jensen's records establish that the claimant's psychiatric symptoms were minimal and well controlled by medications. They also fail to reflect any significant functional limitations resulting from the claimant's mental health impairments, and support my conclusion that these impairments were nonsevere.

Other evidence supports the finding that the claimant's mental health impairments were nonsevere. For example, Kathleen Mayers, Ph.D., performed a consultative psychological evaluation in June 2006, when she noted the claimant's report that the "main problem interfering with his ability to work" was "problems using his hands and legs," which suggests that his mental health condition did not cause significant limitations. Regarding substance abuse, the claimant reported a history of alcohol and cocaine use, and said that he most recently used marijuana the month of the evaluation. The claimant reported using marijuana once or twice a month, but said that he recently made a promise to his physician that he would not use it again (Ex.4F/1). The claimant reported problems with depression and acknowledged feelings of helplessness, hopelessness, and worthlessness, but added that he was able to experience joy and pleasure. The claimant endorsed PTSD symptoms including recurrent, intrusive, and distressing memories, avoiding things that reminded him of past traumatic experiences, flashbacks that occurred rarely, and endorsed an exaggerated startle response and hypervigilance. The claimant also reported anxiety regarding finances (Ex. 4F/3).

Mental status examination findings were essentially unremarkable. Dr. Mayers noted that the claimant spoke in a logical, organized, coherent, and goal directed manner with good vocabulary and communication. He was fully oriented to person, place and date. His performance on digit span testing was good. Dr. Mayers stated that the claimant's fund of knowledge was good, as was his concentration as evidenced by his correct performance on serial seven and three subtractions, his ability to correctly perform two different three-stage directions, and his ability to spell "world" correctly forwards and backwards (Ex. 4F/3). Dr. Mayers stated that the claimant's abstraction skills were good, and his judgment and insight were fair to good (Ex. 3F/4). Dr. Mayers diagnosed PTSD, cannabis abuse, polysubstance dependence in reported remission, and adjustment disorder with depressed mood (Ex. 4F/4). She assigned a global assessment of functioning (GAF) score of 61, indicating

only mild symptoms or mild limitations in social or occupational functioning.[3] Dr. Mayers opined that the claimant's emotional difficulties were "unlikely to interfere with employment" and stated that his judgment and reasoning were fair to good, his memory ranged from poor to good, he had good social skills, his concentration and task persistence were good, and his adaptability to a work-like setting was fair (Ex. 4F/5). Dr. Mayers' observations, the claimant's performance on mental status examination, and the assigned GAF score are not consistent with significant functional limitations and support the finding that these impairments are nonsevere.

In addition, I note that during a Cooperative Disability Investigation Unit (CDIU) investigation performed in September 2006, the claimant told the investigating officers that while applying for VA benefits, he "finally gave in and said that he had mental problems so that he could get benefits" (Ex. 7E/6). This statement, when considered in connection with the observations of consultative examiner Dr. Mayers and the claimant's performance on mental status examination, supports the conclusion that the claimant's mental health symptoms do not cause significant functional limitations. The report of the CDIU investigation is considered as only one piece of evidence in this case. As such, the observations support my ultimate conclusions in this case.

After considering the evidence of record, I give very little weight to the opinion of treating psychiatrist, Dr. Jensen, who completed a form in October 2006 at the request of the claimant's representative on which he checked numerous boxes indicating that the claimant had "no useful ability to function" in various mental abilities, including the ability to maintain regular attendance, sustain an ordinary routine, complete a normal workday and workweek, perform at a consistent pace, get along with co-workers or peers, and respond to changes in a work like setting. The support for these assessed limitations was listed as "anxiety, depression, anger, stress intolerance, as well as multiple medical problems" (Ex. 10F/2). Dr. Jensen stated that the claimant was unable to perform skilled work because he had "no useful ability to function" in abilities to understand, remember, and carry out detailed instructions and to deal with the stress of semiskilled and skilled work. He further indicated that the claimant was unable to interact appropriately with the general public and to travel in unfamiliar places (Ex. 10F/3). Finally, Dr. Jensen indicated on a form that the claimant was markedly limited in maintaining social functioning and concentration, persistence, or pace, and had three episodes of decompensation within a 12 month period (Ex. 10F/4).

---

[3] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007). It is "relevant evidence" of the claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007). As noted by the ALJ, "[a] GAF score of 61-70 reflects mild symptoms or "some difficulty [in social, occupational, or school functioning], but the individual 'generally function[s] pretty well.'" Sims v. Barnhart, 309 F.3d 424, 427 n.5 (7th Cir. 2002) (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (4th ed. 1994) (DSM-IV) at 30).

Having carefully considering the entire record, I do not find Dr. Jensen's opinion persuasive and decline to give it significant weight for several reasons. First, his assessments of the claimant's functioning are wholly unsupported by his own longitudinal treatment records as well as observations of other sources, as discussed above. For example, by all accounts, the claimant has performed within normal limits on mental status examinations, particularly with regard to concentration, persistence, and pace. Moreover, the record shows that the claimant is social and able to engage in appropriate interpersonal interactions. Finally, as discussed above and more thoroughly below, the claimant's significant unrestricted activities reflect an ability to maintain a schedule, persist, and perform various tasks throughout the day. I also note that this form consists primarily of check-box assessments, which are not accompanied by sufficient narrative explanation. In light of the record considered as a whole, these cursory assessments cannot be given significant weight. Finally, the form was completed in anticipation of the hearing and of this disability determination, and it is likely that Dr. Jensen relied to some degree on the claimant's subjective reports in order to assist him in his claim for benefits. For all these reasons, this unsupported assessment, which is inconsistent with the record when considered in its entirety, is not persuasive, and is accordingly given very little weight. Greater weight is given to the opinion of consultative examiner Dr. Mayers, which was based on mental status examination findings and is consistent with the treatment records of evidence that reflect only mild functional limitations.

The claimant's medically determinable mental impairments of depression and PTSD, considered singly and in combination, did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities prior to the date last insured, and were therefore nonsevere. In making this finding, I have considered the four broad functional areas set out in the disability regulations for evaluating mental disorders . . .

The first functional area is activities of daily living. In this area, the claimant had mild limitation. The claimant reported to consultative examiner Dr. Mayers that he enjoyed television, fishing, music, movies, classic cars, and the outdoors (Ex. 4F/2). He said that he lived with his ex-wife, daughter, and two grandsons. The claimant reported that he was independent in cleaning and dressing. He said he fed and watered his ex-wife's 20 show dogs in the morning, which took all morning. In the afternoon, he cleaned a portion of the house, prepared dinner, interacted with the grandchildren, ate dinner, spent an hour cleaning up afterwards, and then watched television and interacted with the family. The claimant reported that he was able to cook, clean, manage money, buy groceries, and drive (Ex. 4F/3). The claimant's significant daily activities, which are also discussed further below, are indicative of no more than mild limitations in this domain.

The next functional area is social functioning. In this domain, the claimant had mild limitation. Consultative examiner Dr. Mayers observed the claimant to be cooperative, attentive, pleasant, and responsive to questions. She stated that the claimant's social skills were good and he maintained good eye contact (Ex. 4F/2). The claimant himself described his social skills as "better than average," noting that he had friends and saw them once or twice a month for a couple hours at a time, and socialized daily with family members (Ex. 4F/4). In addition, during the CDIU investigation, both investigators noted that the claimant was "engaging and very friendly" and did not appear depressed, nor did he display any outward signs of anxiety (Ex. 7E/6). Moreover, the claimant has interacted appropriately with a variety of health care providers on numerous occasions (Exs. 1F, 6F, 11F, 17F, and 18F). Mild limitations are supported in social functioning.

The third functional area is concentration, persistence or pace. In this area, the claimant had mild limitation. During the June 2006 consultative evaluation, the claimant reported that he was able to concentrate for "a couple of hours" (Ex. 4F/2), and Dr. Mayer described the claimant's concentration and task persistence as good and his pace as average to brisk, based on mental status examination (Ex. 4F/4). Moreover, the claimant's documented activities are indicative of an ability to concentrate, persist, and pace, as he performs various and numerous tasks on a daily basis. Accordingly, based on the entire record, I do not agree with the State agency determination that the claimant had moderate limitations in this domain (Ex. 9F), particularly because the State agency consultants provided no narrative justification for the limitation (Ex. 10F).

The fourth functional area is episodes of decompensation. The record does not establish that the claimant experienced any episodes of decompensation of the extended duration required by the regulations.

Because the claimant's medically determinable mental impairments caused no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they were nonsevere . . .

Tr. 23-27.

Plaintiff argues the ALJ erred in discounting Dr. Jensen's opinion on the basis that it was not supported by the objective medical evidence in the record, including his own treatment notes, citing to Orn v. Astrue, 495 F.3d 625 (9th Cir. 2007). In that case, the Ninth Circuit stated that "[t]he primary function of medical records is to promote communication and recordkeeping for

health care personnel – not to provide evidence for disability determinations." Id. at 634. Thus, it is not required for disability determination purposes, "that a medical condition be mentioned in every [medical] report to conclude that a physician's opinion is supported by the record." Id. But while obviously true, this does not take away from the fact that an ALJ properly may discount the opinion of even a treating physician, if that opinion is "inadequately supported by clinical findings" or "by the record as a whole." Batson, 359 F.3d at 1195; see also Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149.

Plaintiff next argues it was improper for the ALJ to completely reject the opinion of Dr. Jensen on the basis that his concentration, persistence and pace was found to be within normal limits. But this is just one example noted by the ALJ of the overall lack of objective medical support in Dr. Jensen's own treatment notes, which constitutes, as noted above, a valid basis for rejecting a medical source opinion. See Tr. 25; see also Tr. 23-24. Plaintiff also finds the ALJ's statement that the record showed him to be social and capable of engaging in social interactions to be both illegitimate and insufficiently specific, but clearly such capability belies Dr. Jensen's opinion that plaintiff's mental health impairments were disabling, and it is unspecific only when not read in context with the rest of the ALJ's findings set forth above.

Although plaintiff challenges as well the nature and extent of the activities that the record shows he has engaged in, as noted by the ALJ above and as discussed in further detail below, the ALJ's description thereof was not inaccurate – which do indeed indicate a fairly strong ability to maintain normal work activities – and thus it is a valid reason for discounting the credibility of Dr. Jensen's opinion. See Morgan, 169 F.3d at 601-02 (upholding ALJ's rejection of physician's conclusion that claimant suffered from marked limitations in part because other evidence of claimant's ability to function, including reported daily activities, contradicted that conclusion);

Magallanes, 881 F.2d at 754 (finding ALJ properly rejected physician's opinion in part on basis that it conflicted with plaintiff's subjective pain complaints).

As for the ALJ noting that the opinion form Dr. Jensen completed consisted "primarily of check-box assessments, which are not accompanied by sufficient narrative explanation," plaintiff argues this is not a valid basis for rejecting Dr. Jensen's opinion, because Dr. Jensen did include written findings in addition to checking boxes. But as plaintiff himself points out, the ALJ was not rejecting Dr. Jensen's opinion on the basis that he provided no written findings, but rather on the basis that the "narrative explanation" provided by those findings was not "sufficient", which is an appropriate basis on which to do so. Tr. 25. See Batson, 359 F.3d at 1195 (ALJ need not accept treating physician opinion if that opinion is brief, conclusory and inadequately supported by clinical findings); see also Thomas, 278 F.3d at 957; Tonapetyan, 242 F.3d at 1149; Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983) (preferring individualized medical opinions over check-off reports).

The undersigned does agree it was not proper for the ALJ to reject Dr. Jensen's opinion on the basis that it "was completed in anticipation of" the hearing and disability determination, and for the purpose of assisting him "in his claim for benefits" (Tr. 25), the ALJ has pointed to nothing in the form Dr. Jensen completed – nor does the undersigned find any – to show this is what Dr. Jensen did here. In addition, absent "evidence of actual improprieties," the purpose for which a medical report is obtained is not a legitimate basis for rejecting it. Lester, 81 F.3d 821, 832 (9th Cir. 1996). Nevertheless, as explained above, the ALJ provided a number of other valid reasons for rejecting Dr. Jensen's opinion.

Lastly, plaintiff argues the ALJ erred in the following manner:

> The ALJ does not mention that on March 28, 2006, Dr. Jensen wrote that [plaintiff] reported being more depressed and irritable, anhedonic, and

REPORT AND RECOMMENDATION - 16

unmotivated; he was dissatisfied with his living situation and having few pleasurable activities. (Tr. 315). Dr. Jensen found that [plaintiff's] mood was sad and his affect was constricted. (Tr. 315). The ALJ also does not mention Dr. Jensen's opinion that [plaintiff's] current GAF was 45 and his highest GAF in the past year was 50. (Tr. 494). The ALJ also does [not] mention that Dr. Jensen wrote that [plaintiff] had occasional side effects from his medications, including occasional dizziness, fatigue, and stomach upset. (Tr. 494). The ALJ also does not mention that Dr. Jensen opined that [plaintiff] suffered from marked anxiety, depression, anger, nightmares, and insomnia, and described his prognosis as poor. (Tr. 494). . . .

ECF #11, p. 19 (internal footnote omitted). As discussed above, though, the mere existence of an impairment – or symptoms stemming therefrom – is not sufficient to establish significant, let alone, disabling limitations, especially given that, at least in regard to the March 2006 treatment note, Dr. Jensen did not link them to any work-related restrictions. <u>See</u> Tr. 315. The same is true with respect to the other symptoms and "occasional" medication side effects Dr. Jensen noted on the opinion form itself. <u>See</u> Tr. 494.

It is true, as plaintiff notes, that a GAF score of 45 to 50 indicates "'[s]erious symptoms" or a "'serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." <u>Pisciotta</u>, 500 F.3d at 1076 n.1 (quoting DSM-IV at 34); <u>see also</u> <u>Cox v. Astrue</u>, 495 F.3d 614, 620 n.5 (8th Cir. 2007) (GAF score in forties may be associated with serious impairment in occupational functioning); <u>England</u>, 490 F.3d at 1023, n.8 (GAF score of 50 reflects serious limitations in individual's general ability to perform basic tasks of daily life). But while the ALJ did not specifically mention these GAF scores in her decision, she did provide a detailed summary of the bulk of the medical evidence in the record regarding plaintiff's mental impairments, including the higher GAF score of 61 assessed by Dr. Mayers, which, as discussed above, does support the ALJ's non-severity determination. Accordingly, any error the ALJ made in not mentioning Dr. Jensen's GAF scores was harmless. <u>See</u> <u>Stout v. Commissioner, Social Security Admin.</u>, 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial

REPORT AND RECOMMENDATION - 17

1  to claimant or irrelevant to ALJ's ultimate disability conclusion).

2      B.    Dr. Cornia

3      In regard to plaintiff's primary care physician, Paul B. Cornia, M.D., the ALJ found in

4  relevant part as follows:

5
6          . . . Dr. Cornia completed a physical residual functional capacity questionnaire
           in January 2007 at the request of the claimant's representative.  Dr. Cornia
           stated that the claimant could walk less than a block without rest or severe
7          pain, and could stand and/or walk for a total of less than two hours and sit for
           a total of about two hours in an eight-hour workday.  He stated that the
8          claimant could sit for two hours at a time and stand for 30 minutes at a time
           (Ex. 16F/2).  Dr. Cornia opined that the claimant could lift less than 10
9          pounds occasionally and 10 pounds rarely. Dr. Cornia assessed postural
           limitations including occasional twisting, rare stooping and crouching, and
10         never climbing ladders.  He stated that the claimant had manipulative
           limitations and could perform occasional fingering and rare grasping and
11         reaching.  Dr. Cornia estimated that the claimant would likely be absent from
           work about two days per month (Ex. 16F/4).
12
13         After considering the entire record, I conclude that Dr. Cornia's opinion is not
           consistent with or supported by the evidence and is unpersuasive particularly
14         in light of the claimant's functioning.  Significantly, when asked in the
           questionnaire to identify clinical findings and objective signs, Dr. Cornia
15         himself stated that musculoskeletal exam and imaging were "largely normal,"
           and noted that the *claimant* rated his pain as severe, indicating that he relied
16         on the claimant's subjective report when assessing limitations, as there was
           little in the way of objective evidence to corroborate the claimant's symptoms
17         or limitations.  Further, Dr. Cornia stated that the claimant's impairments were
           *not reasonably consistent* with the symptoms and limitations described in the
18         evaluation, noting that despite extensive evaluations and subspecialty
           referrals, an etiology for the claimant's symptoms of pain, dizziness, and
19         generalized weakness had not been diagnosed or identified (Ex. 16F/1-2).
           Given the doctor's concession that examinations had been normal and there
20         was not [an] identified cause for the claimant's alleged symptoms, the
           limitations he assigned are rendered less reliable.  When considered in light of
21         the remainder of the record, which establishes a high degree of functioning
           and extensive activities, as well as a significant lack of objective findings that
22         would support the claimant's allegations, the limitations contained in this
           solicited questionnaire are not persuasive and are entitled to very little weight.
23
24
25  Tr. 33 (emphasis in original).  Plaintiff argues the ALJ's stated reasons for rejecting the opinion
26  of Dr. Cornia are not legitimate, asserting specifically that in noting the lack of objective clinical

REPORT AND RECOMMENDATION - 18

findings supporting Dr. Cornia's opinion, the ALJ failed to mention the list of plaintiff's "many diagnoses" attached thereto. ECF #11, p. 20; see also Tr. 737-38. Once more, however, a mere diagnosis is not the same as actual findings establishing the existence of work-related limitations, and therefore is not sufficient in itself to demonstrate disability.

Next, in taking issue with the ALJ's discounting of Dr. Cornia's opinion on the basis that it appeared to rely to a large extent on plaintiff's own subjective complaints, plaintiff argues that a treating physician "must always rely to some extent on their patients' complaints of pain, and there is no indication anywhere in the record that Dr. Cornia questioned the legitimacy of [plaintiff's] complaints of pain." ECF #11, p. 20. Nevertheless, it is clear that the opinion of a physician premised on a claimant's subjective complaints may be discounted where the record supports the ALJ in discounting the claimant's credibility. See Tonapetyan, 242 F.3d at 1149; see also Morgan, 169 F.3d 595, 601 (9th Cir. 1999). This is true even though as plaintiff notes, "[a] patient's report of complaints . . . is an essential diagnostic tool," and "[a]ny medical diagnosis must necessarily rely upon" those complaints. Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997) (citation omitted).

In addition, although it also is true that "an ALJ does not provide clear and convincing reasons for rejecting [a physician's] opinion by questioning the credibility of the [claimant's] complaints, where the [physician] does not discredit those complaints," this is so only where the physician "supports his ultimate opinion with his own observations." Ryan v. Commissioner of Social Security, 528 F.3d 1194, 1199-1200 (9th Cir. 2008). Unlike in Ryan, however, where there was "nothing in the record to suggest" the physician in that case relied on the claimant's own "description of her symptoms . . . more heavily than his own clinical observations" (Id. at 1200), here, as the ALJ noted, Dr. Cornia himself admitted plaintiff's symptoms and limitations

were not supported by objective clinical findings.

As for plaintiff's assertion that the ALJ did not acknowledge that Dr. Cornia would not, as his treating physician, prescribe him numerous medications "if he did not genuinely believe" he needed them. ECF #11, p. 20. Again, however, the mere fact that one is receiving prescribed medications, even ones such as Methadone, alone does not necessarily indicate the presence of significant work-related limitations, even though the prescribing physician may be believe such medications are necessary or beneficial. Although plaintiff describes the ALJ's rejection of Dr. Cornia's opinion as "second-guess[ing]" his medical expertise concerning plaintiff's conditions (id.), the undersigned finds the ALJ was merely exercising her sole responsibility for evaluating the medical and other evidence in the record as she was required to do.

IV.     The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. See Sample, 694 F.2d at 642. The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. See id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan , 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear

and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen, 80 F.3d at 1284. The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. See id.

The ALJ discounted plaintiff's credibility in part on the basis that his complaints were not consistent with the objective medical evidence in the record. See Tr. 28-29. A determination that a claimant's pain and other subjective complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). Plaintiff argues the ALJ's entire assessment of plaintiff's credibility is tainted by her errors in evaluating the medical evidence in the record. But as discussed above, the ALJ did not so err, and therefore the undersigned finds no such taint here. Plaintiff goes on to argue that "the record actually shows many hospitalizations, much medical treatment, and numerous prescribed medications." ECF #11, p. 21. Once more, though, such evidence does not establish the existence of significant work-related limitations.

The ALJ also discounted plaintiff's credibility in part for the following reason:

I also note that, although the claimant reports constant and debilitating pain, the record shows that his pain complaints have varied. For example, when the claimant participated in physical therapy for back pain and fibromyalgia in early 2006, he repeatedly reported that he did not have any back pain. In January 2006, the claimant reported that he did not have any back pain at all that day, but his hands and hips were bothering him (Ex. 1F/119). In February 2006, he reported that his back was "fine" and he had "no pain at all" at the visit (Ex. 1F/119). At a subsequent visit, the claimant reported that his back pain was "down to one out of ten." The claimant was discharged from physical therapy secondary to meeting his goals (Ex. 1F/117-118). The

claimant's reports during physical therapy are inconsistent with his allegations
of constant extreme and debilitating pain despite chronic narcotic medication.
These records render his pain complaints less credible.

Tr. 30. Here too the ALJ did not err. See Smolen, 80 F.3d 1273, 1284 (9th Cir. 1996) (ALJ may consider prior inconsistent statements concerning symptoms). Plaintiff argues this is not a valid reason for discounting his credibility, especially since none of his physicians have questioned the legitimacy of his pain complaints. But in this instance the ALJ is not discounting the credibility of plaintiff's physicians, but of plaintiff himself. See Ryan, 528 F.3d at 1199-1200 (ALJ does not provide clear and convincing reasons for rejecting physician's opinion by questioning credibility of claimant's complaints, where physician does not discredit them, and supports his opinion with his own observations). In any event, it is the sole responsibility of the ALJ, and not any medical source, to assess plaintiff's credibility. See Sample, 694 F.2d at 642.

Plaintiff argues the ALJ's statement that the reports he made "during physical therapy are inconsistent with his allegations of constant extreme and debilitating pain despite chronic narcotic medication" (Tr. 30), is "non-specific, unconvincing, and not supported by substantial evidence, and it does not accurately describe [his] allegations" (ECF #11, p. 21). But plaintiff provides no specific argument as to why this statement is unconvincing, nor does he explain in any detail as to in what way or ways it is unsupported by the record or inaccurately describes his allegations. See Carmicle, 533 F.3d 1155, 1161 n.2 (issue not argued with specificity will not be addressed); Kim, 154 F.3d at 1000 (matters not specifically and distinctly argued ordinarily will not be considered). In addition, once more the statement is only non-specific when taken out of context of the ALJ's previous findings just discussed.

The ALJ further discounted plaintiff's credibility in part because:

While the evidence reveals that the claimant has been observed to walk with a
crutch for some time, the records do not indicate that the crutch was

REPORT AND RECOMMENDATION - 22

> prescribed by a physician. . . . the CDIU investigators noted that he was able
> to react quickly and move without his crutch when [his] dogs were out of
> control. . . .

Tr. 30.[4]  Plaintiff argues the fact that he was able to react in this way in an emergency situation is

not a convincing reason to discount his credibility or a legitimate basis on which to conclude he

does not need a cane.  But as noted by the ALJ, nothing in the record indicates that a crutch had

been prescribed by a physician, even though John Lesher, M.D., an examining physician, did not

object to continued use thereof, notably without expressing any opinion that such was actually

medically required.  See Tr. 415 ("The claimant can continue to use a forearm crutch for balance

and long distances.").  Nor does the record indicate the situation in which plaintiff had reacted as

he did was an "emergency" situation.  See Tr. 175.  Even if it did, however, nothing in the record

undercuts the ALJ's determination that plaintiff's reaction was indicative of an ability to function

physically at a level greater than he claimed.

The ALJ discounted plaintiff's credibility as well in part on the following basis:

> A very significant factor weighing against the credibility of the claimant's
> allegations in this case are the significant activities documented by the record.
> Despite alleging symptoms and limitations so severe that they preclude all
> work activity, the record establishes that the claimant is highly functional and
> engages in numerous activities that belie his allegations of disability.  The
> record shows that the claimant has been consistently active and functional to a
> degree consistent with an ability to perform work activities on a regular basis.
> For example, in a Function Report he completed in May 2006, the claimant
> reported that four days a week, he got up at 5:30 a.m., woke his two grandsons
> and made sure they got dressed, ate breakfast, and caught the school bus at
> 6:20 a.m.  The claimant said that he went back to bed until 8:30, when he got
> up, ate breakfast, showered, dressed, and then fed and watered the dogs for
> two hours, until about noon. The claimant reported that he then took "a one
> hour break" to eat lunch, after which he did chores including dusting, washing
> the dishes, or whatever needed to be done.  He said that he cleaned the kitchen
> and living room floors until 5:00 p.m., with five to ten minute breaks as

---

[4] A little further on in her decision, the ALJ again noted that "in September 2006, CDIU investigators observed the claimant walk without his cane, dragging it on the ground, and that he 'moved quickly and displayed more agility' than he had previously demonstrated." Id.

needed. He then cooked dinner and cleaned up afterwards, and watched television until 11:00 p.m., when he went to bed (Ex. 6E/1). The claimant's report of a typical day contains numerous activities that are consistent with an ability to perform light work and clearly indicate an ability to tolerate and persist throughout an eight-hour workday. In addition, the claimant reported that he had no problems with personal care, prepared meals for an hour to an hour and a half daily, and performed household chores including dusting, laundry, cleaning the floors, mowing the yard, and simple home repairs (Ex. 6E/3). The claimant reported socialization including going fishing two or three times a month with his grandchildren and his best friend of 20 years, and talking to his brothers and his best friend on the phone daily (Ex. 6F/5). The claimant's activities establish a high degree of functioning that is inconsistent with his allegations.

The claimant similarly reported to consultative examiner Dr. [John] Lesher[, M.D.,] in June 2006 that his daily activities consisted of arising early to get his grandchildren ready for school. He said that he was independent with his basic activities of daily living, and spent time "feeding the approximately 20 dogs" that lived on his property in kennels. The claimant said he then performed yard work if needed on his three an[d] a half acres of property, including mowing the grass using a riding lawnmower. The claimant said that he normally cooked dinner for his family and did the laundry, including his wife's laundry. The claimant said that he used the dishwasher and that his "cleaning duties" included dusting, sweeping, and mopping if needed (Ex. 3F/2). Significantly, Dr. Lesher noted that the claimant was dirty in appearance, wearing jeans that had evident dirt marks at the knees (Ex. 3F/4). He stated that "based on his reported daily activities and dirty jeans that appear freshly soiled at the knee level," it appeared that the claimant was "functioning at a relatively high level" (Ex. 3F/5).

Other evidence corroborates the claimant's activities and shows greater capabilities than he alleges. The claimant's roommate stated in a Third Party Function Statement that the claimant spent his day helping with household and property chores as much as possible and also watched his grandchildren. She stated that four days a week, the claimant got his grandchildren off to school, watched them after school, and cooked them meals. The claimant's roommate stated that the claimant prepared multiple meals on a daily basis, and also did laundry, dusted, cleaned the floors, and mowed the lawn, which she said took two hours to perform. She stated that the claimant did laundry once a week for two hours, dusted twice a week for three hours, and that floor cleaning took three hours. The claimant's roommate said that the claimant went out daily, and was able to go out alone and drove a car. She said his hobbies included watching television, which he did daily, and going fishing two or three times a month. The claimant's roommate said that he spent time with his best friend of 20 years a couple times a month and talked on the phone daily (Ex. 5E).

REPORT AND RECOMMENDATION - 24

In addition, during the September 2006 CDIU investigation, the detectives observed the claimant to get out of his truck without displaying any physical impairment. He turned at the waist, reached into the cab of the truck, and retrieved a walking cane. The detectives observed the claimant walk 30 to 35 yards with the cane, but did not display any outward signs of physical distress, nor was he short of breath. When one of the claimant's dogs jumped on one of the detectives, the claimant "immediately bent over, grabbed the dog by the collar, and dragged it across the street where he put it into [a] fenced yard," and the detectives noted that the claimant "moved quickly and displayed more agility" than he had demonstrated. In addition, the claimant walked across the street "pulling the dog by the collar with his left hand and holding the cane with his right" so that the "cane was dragging on the ground and was not used for support" (Ex. 7E/5-6). Finally, the detectives asked the claimant how many dogs he had, and he reported that he had 19. He told the detectives that he took care of the dogs, and had to "bathe the dogs once a week and feed them regularly along with cleaning out the kennels" (Ex. 7E/6).

The claimant's documented abilities to care for children, numerous animals, and maintain a household, as well as attending adequately to his own personal needs and engage in leisure and social activities, establishes a high degree of functioning that undermines his allegations of very severe limitations that prevent him from performing all work activity.

More recent records establish that the claimant has continued to engage in a significant level of activity. In March 2008, the claimant reported that he recently returned to his ex-wife and said that he kept the house clean, noting that she had 21 dogs, five of which were in the house, cooked the meals, and cared for his 15 year old grandson. The claimant reported that he didn't "mind the work per se," but that no one helped him (Ex. 17F/54). The claimant reported that his leisure time activities were fishing, watching movies, and spending a lot of time with his grandson (Ex. 17F/55).

Tr. 30-32.

To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. The Ninth Circuit has recognized "two grounds for using daily activities to form the basis of an adverse credibility determination." Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007). First, those activities can "meet the threshold for transferable work skills." Id. Symptom testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are

REPORT AND RECOMMENDATION - 25

transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be found disabled, though, and "many home activities may not be easily transferable to a work environment." Id. Under the second ground recognized by the Ninth Circuit, the claimant's daily activities can "contradict his other testimony." Orn, 495 F.3d at 639.

In this case, the ALJ's above findings show that both grounds have been met. Plaintiff asserts, without any further elaboration or citation to the record, that the activities set forth above do not show he could perform full-time light work activity on a sustained basis, and that they are not inconsistent with his own testimony about his own limitations. Again, such argument is not sufficient to meet plaintiff's burden of proof on this issue.[5] See Carmicle, 533 F.3d 1155, 1161 n.2 (issue not argued with specificity will not be addressed); Kim, 154 F.3d at 1000 (matters not specifically and distinctly argued ordinarily will not be considered). In any event, it is clear that the activities the ALJ described in detail above are wholly inconsistent with plaintiff's claim that he is unable to perform any work and is therefore disabled, and thus they form a sufficient basis upon which the ALJ could discount plaintiff's credibility.

V.      The ALJ's Evaluation of the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Id. at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample,

---

[5] See Tackett, 180 F.3d at 1098-99 (claimant has burden of proof on steps one through four of sequential disability evaluation process).

694 F.2d at 642.

The record contains a written statement from plaintiff's roommate, in which she sets forth her observations of plaintiff's symptoms and limitations. <u>See</u> Tr. 152-59. With respect thereto, the ALJ found as follows:

> In assessing the claimant's residual functional capacity, I have also considered lay evidence of record, including a Third Party Function Report completed by the claimant's roommate, Lauren Couch, in May 2006. Ms. Couch indicated that the claimant had difficulty lifting, sitting, squatting, kneeling, bending, standing, using his hands, reaching, walking, completing tasks, remembering, and concentrating. She stated that the claimant could not lift more than 20 pounds, could not squat at all, could stand and sit for about half an hour, and could walk for 200 feet before needing to rest (Ex. 5E). The lay witness statement has been considered and is generally corroborative of the claimant's allegations. However, I am unable to find the statement probative in terms of the ultimate issue of disability in light of the medical evidence and other factors in this case, particularly, the claimant's documented activities and abilities. The lay witness herself was reliant to some extent upon the claimant's subjective symptoms of his impairments, which are not fully credible, as discussed above. Further, the lay witness statement cannot outweigh the analysis of the objective medical evidence, as well as the claimant's overall functional abilities.

Tr. 34-35. Plaintiff argues none of these reasons are germane to his roommate, and thus they are not valid reasons for rejecting her statement. The undersigned disagrees.

An ALJ may discount lay testimony if it conflicts with the medical evidence. <u>Lewis</u>, 236 F.3d at 511; <u>see also</u> <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1218 (9th Cir. 2005) (inconsistency with medical evidence constitutes germane reason); <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with medical evidence); <u>but</u> <u>see</u> <u>Bruce</u>, 557 F.3d at 1116 (improper for ALJ to discredit testimony of claimant's wife as not supported by medical evidence in record).[6] An ALJ also may reject lay witness evidence if

---

[6] In so holding, the Ninth Circuit in <u>Bruce</u> relied on its prior decision in <u>Smolen</u>, which held that the ALJ improperly rejected the testimony of the claimant's family on the basis that medical records did not corroborate the claimant's symptoms, because in so doing the ALJ violated the Commissioner's directive "to consider the testimony of lay witnesses where the claimant's alleged symptoms are *unsupported* by her medical records." <u>Bruce</u>, 557 .3d at 1116

other evidence in the record regarding the claimant's activities is inconsistent therewith. <u>See</u>

<u>Carmickle</u>, 533 F.3d 1155, 1164 (9th Cir. 2008) (ALJ's rejection of lay witness evidence because

it was inconsistent with claimant's successful completion of continuous full-time coursework

constituted reason germane to claimant).  In light of detailed evaluation of that evidence the ALJ

provided discussed above, she did not err in rejecting the statement of plaintiff's roommate on

these bases.  Because of this, the ALJ did not err in failing to specifically mention in her decision

the lay witness's observations concerning plaintiff's walker and use of his hands.

VI.    <u>The ALJ's Assessment of Plaintiff's Residual Functional Capacity</u>

     If a disability determination "cannot be made on the basis of medical factors alone at step

---

(citing 80 F.3d at 1289) (emphasis in original).  The Court of Appeals, however, did not address its earlier decisions in <u>Bayliss</u>, <u>Lewis</u> and <u>Vincent</u>, in which, as discussed above, it expressly held that "[o]ne reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence." <u>Lewis</u>, 236 F.3d at 511 (citing <u>Vincent</u>, 739 F.2d at 1995); <u>see also</u> <u>Bayliss</u>, 427 F.3d at 1218.  Accordingly, although <u>Bruce</u> is the Ninth Circuit's most recent pronouncement on this issue, given that no mention of <u>Bayliss</u>, <u>Lewis</u> or <u>Vincent</u> was made in that case, and that none of the holdings in those earlier decisions concerning this issue were expressly reversed, it is not at all clear whether discounting lay witness evidence on the basis that it is not supported by the objective medical evidence in the record is no longer allowed.  Plaintiff, though, has not challenged this basis for discounting plaintiff's mother's statement.  Accordingly, the undersigned shall treat those earlier holdings as being still good law.

     In addition, the undersigned agrees with the reasoning employed by United States Magistrate Judge Mary Alice Theiler to distinguish <u>Bruce</u> in a recent case:

> As asserted by [defendant], the Ninth Circuit's decision in *Bruce* can be distinguished.  In that case, the Court rejected as improper the ALJ's reasoning that the lay testimony was "not supported by the objective medical evidence." 557 F.3d at 1116.  The ALJ in *Bruce* did not point to any specific evidence, contradictory or otherwise, in support of this conclusion.  Instead, the ALJ *appeared to discount in general the value of lay testimony in comparison to objective medical evidence*.  *Smolen*, cited in *Bruce*, can be similarly distinguished.  In that case, the Court noted that the claimant's disability was based on fatigue and pain, that the medical records were "sparse" and did not "provide adequate documentation of those symptoms[,]" and that . . . the ALJ was consequently required to consider the lay testimony as to those symptoms. 80 F.3d at 1288-89.  The ALJ in *Smolen*, therefore, had erred in rejecting the lay testimony because " 'medical records, including chart notes made at the time, are far more reliable and entitled to more weight than recent recollections made by family members and others, made with a view toward helping their sibling in pending litigation.' " *Id.* at 1289.  As in *Bruce*, the ALJ *essentially rejected the value of lay testimony as compared to objective medical evidence*.

<u>Staley v. Astrue</u>, 2010 WL 3230818 *19 (W.D. Wash. 2010) (emphasis added).  Likewise, here the ALJ discounted the lay witness's statements because of their inconsistency with other evidence in the record, including the objective medical evidence discussed herein, and <u>not</u> because she found in general the evidentiary value of such statements to be less than that provided by the objective medical evidence.

REPORT AND RECOMMENDATION - 28

three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. See id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. See id. However, an inability to work must result from the claimant's "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

In this case, the ALJ assessed plaintiff with the residual functional capacity:

> **. . . [T]o perform the full range of light work . . . , specifically, the ability to lift and/or carry 20 pounds occasionally and 10 pounds frequently, to stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, and to sit (with normal breaks) for a total of about six hours in an eight-hour workday.**

Tr. 27 (emphasis in original). Plaintiff argues that because of the ALJ's errors in rejecting the opinions of Drs. Jensen and Cornia, as well as the VA disability determination, she also erred in assessing the above RFC. As discussed above, however, the ALJ did not err in evaluating that evidence. Accordingly, the undersigned also finds no error in the ALJ's assessment of plaintiff's residual functional capacity on this basis.

Plaintiff also argues the ALJ erred as well by failing to include the moderate limitation in

the ability to complete a normal workday and workweek and perform at a consistent pace found by Thomas Clifford, Ph.D., and William Lysak, Ph.D. <u>See</u> Tr. 477. As discussed above, though, the properly found plaintiff had no severe mental impairment. As part of that finding, the ALJ as noted above, expressly stated that she disagreed with the determination of Drs. Clifford and Lysak that plaintiff "had moderate limitations" in the domain of concentration, persistence and pace – the domain in which the above specific limitation falls – "particularly because [they] provided no narrative justification for the limitation." Tr. 26-27, 477-78; <u>see</u> <u>Batson</u>, 359 F.3d at 1195 (ALJ need not accept physician opinion if that opinion is brief, conclusory, and inadequately supported by clinical findings or by record as whole); <u>Thomas</u>, 278 F.3d at 957; <u>Tonapetyan</u>, 242 F.3d at 1149 (9th Cir. 2001).

On the other hand, the undersigned agrees with plaintiff that the ALJ erred in failing to include – or to explain why she was not including – in her assessment of plaintiff's RFC, all of the limitations described by Dr. Lesher in his opinion, including a need for "frequent breaks for changes in position" and a restriction to only occasional bending, stooping and crouching. Tr. 415. In her decision, the ALJ stated she was giving "the greatest weight to the opinion of . . . Dr. Lesher," after noting the noted need for frequent position change breaks, as Dr. Lesher's opinion was "consistent with the objective evidence of record." Tr. 32. As noted above, however, the ALJ included no such limitations in her residual functional capacity assessment. The failure to do so despite the great weight she gave to Dr. Lesher's opinion, or explain why those limitations were not being adopted, constitutes reversible error.

VII.    <u>The ALJ's Step Four Determination</u>

Plaintiff has the burden at step four of the disability evaluation process to show that [s]he is unable to return to his past relevant work. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir.

1999).  Because of the ALJ's error in assessing plaintiff's residual functional capacity discussed above, the undersigned further agrees with plaintiff that the ALJ's determination that he is able to return to his past relevant work is not clearly supported by substantial evidence in the record, and therefore cannot be upheld at this time.

VIII.    The ALJ's Findings at Step Five

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do.  See Tackett, 180 F.3d at 1098-99; 20 C.F.R. § 404.1520(d), (e).  The ALJ can do this by reference to defendant's Medical-Vocational Guidelines (the "Grids").  Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).  Plaintiff argues he should have been found disabled pursuant to Grid Rule 201.06.  But that rule only applies to claimants who are limited to sedentary work, and the record at this point fails to show he is so limited.  See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.06.  Accordingly, the ALJ was not required to find plaintiff disabled at step five.

IX.    This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits."  Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate."  Id.

Benefits may be awarded where "the record has been fully developed" and "further

administrative proceedings would serve no useful purpose." <u>Smolen</u>, 80 F.3d at 1292; <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

<u>Smolen</u>, 80 F.3d 1273 at 1292; <u>McCartey v. Massanari</u>, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues remain with respect to the medical evidence in the record from Dr. Lesher, and, as such, with respect to plaintiff's residual functional capacity and his ability to return to his past relevant work at step four of the sequential evaluation process, this matter should be remanded to defendant for further administrative proceedings. In addition, if on remand, it is determined that plaintiff is not able to return to his past relevant work, defendant shall proceed on to step five to determine whether he is capable of performing other work existing in significant numbers in the national economy.

CONCLUSION

Based on the foregoing discussion, the Court should find defendant improperly concluded plaintiff was not disabled. Accordingly, the Court should reverse defendant's decision and remand this matter to defendant for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have **fourteen (14) days** from service of this Report and Recommendation to file written objections thereto. <u>See</u> <u>also</u> Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>See</u> <u>Thomas v. Arn</u>,

474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **July 8, 2011**, as noted in the caption.

DATED this 17th day of June, 2011.

Karen L. Strombom
United States Magistrate Judge